**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, et al.**<br>*ex rel.* **[UNDER SEAL]**<br><br>       **Plaintiff-Relator,**<br><br>   **v.**<br><br>**[UNDER SEAL]**<br><br>       **Defendants.** | **Civil Action No. _____**<br><br><br>**QUI TAM COMPLAINT FOR**<br>**VIOLATIONS OF THE FALSE CLAIMS**<br>**ACT, 31 U.S.C. §§ 3729, *ET SEQ*., AND**<br>**SIMILAR STATE PROVISIONS**<br><br><br><br><br>**FILED UNDER SEAL**<br>**JURY TRIAL DEMANDED** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al. *ex rel.* JONATHAN MAYER, | Civil Action No. _____ |
| **Plaintiff-Relator,** | **QUI TAM COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *ET SEQ*., AND SIMILAR STATE PROVISIONS** |
| v. | |
| ADCS Clinics, LLC; ADCS Billings, LLC; Advanced Dermatology of Alabama, Inc.; Advanced Dermatology of Arizona, PC; Advanced Dermatology of Colorado, PC; Advanced Dermatology of Georgia, LLC; Advanced Dermatology of Maryland, PC; Advanced Dermatology of Michigan, PC; Advanced Dermatology of Ohio, Inc.; Advanced Dermatology of Pennsylvania, PC; Advanced Dermatology of Rhode Island, PC; Advanced Dermatology of S.C., PC; Advanced Dermatology of Virginia, Inc.; Advanced Dermatology of Wyoming, Inc.; Bettencourt Skin Center, PLLC; Leavitt Medical Associates of Florida, Inc.; Skin Pathology Associates, LLC; Harvest Partners, LP; Audax Management Company, LLC; and Audax Group, LP, | **FILED UNDER SEAL JURY TRIAL DEMANDED** |
| **Defendants.** | |

## I.    INTRODUCTION

1.    Qui Tam Relator Jonathan Mayer, MD, MPH ("Relator") files this complaint on his own behalf and on behalf of the United States of America and multiple states (identified in Paragraph 2 below) to recover civil damages, penalties, and other remedies arising from false claims submitted by the Defendants: ADCS Clinics, LLC; ADCS Billings, LLC; Advanced Dermatology of Alabama, Inc.; Advanced Dermatology of Arizona, PC; Advanced Dermatology of Colorado, PC; Advanced

Dermatology of Georgia, LLC; Advanced Dermatology of Maryland, PC; Advanced Dermatology of Michigan, PC; Advanced Dermatology of Ohio, Inc.; Advanced Dermatology of Pennsylvania, PC; Advanced Dermatology of Rhode Island, PC; Advanced Dermatology of S.C., PC; Advanced Dermatology of Virginia, Inc.; Advanced Dermatology of Wyoming, Inc.; Bettencourt Skin Center, PLLC; Leavitt Medical Associates of Florida, Inc.; Skin Pathology Associates, LLC; Harvest Partners, LP; Audax Management Company, LLC; and Audax Group, LP (collectively "Defendants").

2.       This complaint arises under the provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"), and similar state provisions, including, but not limited to, the following:

- Colorado Medicaid False Claims Act, Rev. Stat. § 25.5-4-304 *et seq.*
- Florida False Claims Act, Fla. Stat. § 68-081 *et seq.*
- Georgia False Medicaid Claims Act, Ga. Code § 49-4-168 *et seq.*
- Maryland False Health Claims Act, Md. Code Ann., Health-Gen § 2-601 *et seq.*
- Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq.*
- Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat § 357.010 *et seq.*
- Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*
- Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*

(collectively, "State False Claims Acts").

3.       The United States of America and the above-named states are the plaintiffs for whom recovery is sought for false and fraudulent claims submitted to government-funded healthcare programs, including, without limitation, Medicare, Medicaid, the Federal Employees Health Benefits Program, TRICARE/CHAMPUS, and the Veterans Administration (collectively "Government Healthcare Programs").

4.       In addition, Relator is the plaintiff for a retaliation claim pertaining to his efforts to stop the Defendants' misconduct and the resulting false claims.

5.       Relator's false claims allegations relate to illegal upcoding, medically unnecessary exams, and prohibited self-referral arrangements orchestrated by the Defendants.

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

6.     The illegal upcoding consisted of the parent company ADCS Clinics, LLC ordering the approximately 350 providers of all of its affiliate/subsidiary companies to stop billing for Evaluation and Management ("E/M") CPT code 99201 and instead upcode such visits to code 99202, which reimbursed a higher amount.  The upcoding was ordered on February 26, 2020 via an email sent to all providers, and such upcoding occurred until the start of 2021, at which time the E/M CPT coding system was changed by the Centers for Medicare & Medicaid Services ("CMS").

7.     The medically unnecessary exams consisted of the parent company ADCS Clinics, LLC ordering the approximately 350 providers of all of its affiliate/subsidiary companies to perform a total body skin exam ("TBSE") on every patient – regardless of the patient's chief complaint, medical history, symptoms, age, or risk factors.  In the field of dermatology, TBSEs are generally recommended for high-risk individuals, such as those with a history of skin cancer.  However, for asymptomatic or low-risk individuals, screening TBSEs are not recommended by professional organizations due to the potential for harm and unintended consequences, including unnecessary biopsies and overtreatment.  Nonetheless, the company closely monitored and scored each provider on TBSE completion rates across all patients.  If a provider did not comply with the company's order, the provider could be subject to disciplinary action.  When performed, such exams often led to upcoding of visits and greater remuneration from CMS.  The medically unnecessary exams were ordered on January 7, 2019 via a published company policy, and such exams have occurred, and continue to occur, through the present.

8.     The prohibited referral arrangements consist of the self-referral of designated health services ("DHS") by the Defendants' dermatologists that supervise a mid-level provider ("MLP"). Because these dermatologists are compensated above fair market value for their supervising and in a way that takes into account their referral of DHS, all referrals of DHS by these dermatologists to the Defendants are violations of Stark Law.  This would make the remuneration paid by CMS to the Defendants illegal for countless thousands of biopsies read by the Defendants' dermatopathologists. The prohibited referral arrangements have been going on for years.

9.     Due to the above activity, the Defendants have repeatedly violated the FCA and similar state provisions.  As outlined in the FCA, 31 U.S.C. § 3729(a)(1)(A), the Defendants

"knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to CMS.

## II.    <u>JURISDICTION AND VENUE</u>

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and 3730(b).  This Court has jurisdiction to entertain a qui tam action.

11.     Relator is an "original source" and otherwise authorized to maintain this action in the name of the United States as contemplated by the FCA.

12.     Venue is appropriate as to each Defendant, in that one or more of the Defendants can be found in, reside in, and/or transact business in this judicial district.  Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

13.     This Court has supplemental subject matter jurisdiction over Defendants' violations and the counts relating to the State False Claims Acts pursuant to 28 U.S.C. § 1367 because Defendants' violations of the State False Claims Acts and/or the federal FCA arise out of a common nucleus of operative fact.  *See also* 31 U.S.C. § 3732(b) (conferring district court jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a state if the action arises from the same transaction or occurrence as an action brought under the federal FCA).

14.     There are no bars to recovery under 31 U.S.C. § 3730(e).

## III.    <u>THE PARTIES</u>

### Relator

15.     The Qui Tam Relator is Jonathan Mayer, M.D., M.P.H. ("Relator").  He is a resident of the State of Colorado.  Relator is a board-certified dermatologist, licensed in the state of Colorado. He obtained his bachelor's degree and Master's of Public Health from Harvard University.  He received his medical degree from Columbia University Vagelos College of Physicians and Surgeons. He completed his residency training at Johns Hopkins University and the University of Colorado.

16.     Relator was employed as a dermatologist by ADCS' Colorado subsidiary, Advanced

Dermatology of Colorado, P.C., from September 1, 2019 to March 27, 2020.

**Defendants**

17.     ADCS Clinics, LLC is the parent company and management company for all of the below Advanced Dermatology state-specific subsidiaries/affiliates.  ADCS Clinics, LLC is a Delaware company that operates as a foreign company in Florida.  Its principal office address and headquarters are at 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation Service Company upon whom service can be made at 1201 Hays St, Tallahassee, FL 32301.

18.     ADCS Clinics, LLC and the state-specific subsidiaries/affiliates together do business under the umbrella name of Advanced Dermatology and Cosmetic Surgery ("ADCS").  ADCS is a private equity-backed dermatology practice.  ADCS states that it is the "nation's largest dermatology practice" with more than 140 locations across 14 states.  ADCS has approximately 350 dermatologists, nurse practitioners, and physician assistants.  In 2012, the majority stake of ADCS was sold to the private equity firm Audax Group, LP.  Then in 2016, the majority stake of ADCS was sold to the private equity firm Harvest Partners, LP with a practice valuation of more than $600 million.  Later in 2016, the practice's CEO said ADCS was worth between $700 million and $1 billion.

19.     ADCS Billings, LLC is a Delaware company that operates as a foreign company in Florida.  Its principal office address and headquarters are at 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation Service Company upon whom service can be made at 1201 Hays St, Tallahassee, FL 32301.

20.     Advanced Dermatology of Alabama, Inc. is an Alabama corporation with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation Service Company upon whom service can be made at 641 S Lawrence St, Montgomery, AL 36104.  Advanced Dermatology of Alabama, Inc. has 1 practice location in Alabama.

21.     Advanced Dermatology of Arizona, PC is an Arizona corporation with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation

Service Company upon whom service can be made at 8825 N 23rd Ave, Ste 100, Phoenix, AZ 85021. Advanced Dermatology of Arizona, PC has 4 practice locations in Arizona.

22.     Advanced Dermatology of Colorado, PC is a Colorado corporation with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation Service Company upon whom service can be made at 1900 W. Littleton Blvd, Littleton, CO 80120. Advanced Dermatology of Colorado, PC has 19 practice locations in Colorado.

23.     Advanced Dermatology of Georgia, LLC is a Georgia company with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is National Registered Agents, Inc. upon whom service can be made at 289 S Culver St, Lawrenceville, GA 30046.  Advanced Dermatology of Georgia, LLC has 3 practice locations in Georgia.

24.     Advanced Dermatology of Maryland, PC is a Maryland corporation with a principal office address of 2401 Research Blvd, Ste 260, Rockville, MD 20850.  Its registered agent is National Registered Agents, Inc. of MD upon whom service can be made at 2405 York Rd, Ste 201, Lutherville Timonium, MD 21093.  Advanced Dermatology of Maryland, PC has 6 practice locations in Maryland.

25.     Advanced Dermatology of Michigan, PC is a Michigan corporation with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is CSC-Lawyers Incorporating Service upon whom service can be made at 2900 West Rd, Ste 500, East Lansing, MI 48823.  Advanced Dermatology of Michigan, PC has 14 practice locations in Michigan.

26.     Advanced Dermatology of Ohio, Inc. is an Ohio corporation with a principal office address of 6905 Perimeter Loop Rd, Ste 230, Dublin, OH 43016.  Its registered agent is Corporation Service Company upon whom service can be made at 50 W Broad St, Ste 1330, Columbus, OH 43215.  Advanced Dermatology of Ohio, Inc. has 4 practice locations in Ohio.

27.     Advanced Dermatology of Pennsylvania, PC is a Pennsylvania corporation with a principal office address of 525 Jamestown St, Ste 206, Philadelphia, PA 19128.  Its registered agent is Corporation Service Company upon whom service can be made at 2595 Interstate Dr, Ste 103, Harrisburg, PA 17110.  Advanced Dermatology of Pennsylvania, PC has 11 practice locations in Pennsylvania.

28.    Several Advanced Dermatology of Pennsylvania, PC offices are located in Philadelphia and its immediate suburbs, including:

- Flourtown, Montgomery County;

- Fort Washington, Montgomery County;

- Norristown, Montgomery County;

- North Wales, Montgomery County;

- Philadelphia-Verree Road, Philadelphia County; and

- Philadelphia - Roxborough, Philadelphia County.

29.    Further, several Advanced Dermatology of Pennsylvania, PC offices are located elsewhere in Pennsylvania, including:

- Beaver, Pennsylvania;

- Hazle Township, Pennsylvania;

- West Mifflin, Pennsylvania;

- White Oak, Pennsylvania; and

- Pittsburgh, Pennsylvania.

30.    Advanced Dermatology of Rhode Island, PC is a Rhode Island corporation with a principal office address of 450 Veterans Memorial Pkwy, Ste 7A, East Providence, RI 02914.  Its registered agent is Corporation Service Company upon whom service can be made at 222 Jefferson Blvd, Ste 200, Warwick, RI 02888.  Advanced Dermatology of Rhode Island, PC has 1 practice location in Rhode Island.

31.    Advanced Dermatology of S.C., PC is a South Carolina corporation with a principal office address of 1410B John B White Sr Blvd, Spartanburg, SC 29306.  Its registered agent is Corporation Service Company upon whom service can be made at 508 Meeting St, West Columbia, SC 29169.  Advanced Dermatology of S.C., PC has 2 practice locations in South Carolina.

32.    Advanced Dermatology of Virginia, Inc. is a Virginia corporation with a principal office address of 4701 Cox Rd, Ste 285, Glen Allen, VA 23060.  Its registered agent is Corporation Service Company upon whom service can be made at 100 Shockoe Slip, 2nd Flr, Richmond, VA 23219.  Advanced Dermatology of Virginia, Inc. has 2 practice locations in Virginia.

33.     Advanced Dermatology of Wyoming, Inc. is a Wyoming corporation with a principal office address of 1908 Thomas Ave, Cheyenne, WY 82001.  Its registered agent is Corporation Service Company upon whom service can be made at 1821 Logan Ave, Cheyenne, WY 82001.  Advanced Dermatology of Wyoming, Inc. has 5 practice locations in Wyoming.

34.     Bettencourt Skin Center, PLLC is a Nevada company with a principal office address of 861 Coronado Ctr, Ste 100, Henderson, NV 89052.  Its registered agent is Miriam Bettencourt upon whom service can be made at 1701 N Green Valley Pkwy, Ste 7-B, Henderson, NV 89074.  Bettencourt Skin Center, PLLC has 1 practice location in Nevada.

35.     Leavitt Medical Associates of Florida, Inc. is a Florida corporation with a principal office address of 151 Southhall Ln, Ste 300, Maitland, FL 32751.  Its registered agent is Corporation Service Company upon whom service can be made at 1201 Hays St, Tallahassee, FL 32301.  Leavitt Medical Associates of Florida, Inc. has 71 practice locations in Florida.  Upon information and belief, Leavitt Medical Associates of Florida, Inc. is the corporate owner of the ADCS locations in Florida.

36.     Skin Pathology Associates, LLC is a Delaware company that operates as a foreign company in Alabama.  Its principal office address is 3550 Independence Dr, Ste 200, Birmingham, AL 35209.  Its registered agent is John Green upon whom service can be made at 3550 Independence Dr, Ste 200, Birmingham, AL 35209.  Skin Pathology Associates, LLC has 1 location in Alabama where 7 dermatopathologists work.

37.     Harvest Partners, LP is a Delaware partnership that operates as a foreign partnership in New York.  It is a private equity investment group.  Its principal office address is at 280 Park Ave, 33rd Floor, New York, NY 10017.  It does not have a registered agent listed.  Harvest Partners, LP became the majority owner of ADCS in 2016.

38.     Audax Group, LP is a Delaware partnership that operates as a foreign partnership in Massachusetts.  It is a private equity investment group.  Its principal office address is 101 Huntington Ave, Floor 23, Boston, MA 02199.  Its registered agent is CT Corporation System upon whom service can be made at 155 Federal St, Ste 700, Boston, MA 02110.  Audax Group, LP bought the majority stake of ADCS in 2012, but became a minority owner in 2016 in the sale to Harvest Partners, LP.

39.    Audax Management Company, LLC is a Delaware limited liability company that operates as a foreign partnership in Massachusetts. Its principal office address is 101 Huntington Ave, Floor 23, Boston, MA 02199.  Its registered agent is CT Corporation System upon whom service can be made at 155 Federal St, Ste 700, Boston, MA 02110.

## IV.    PRELIMINARY STATEMENT

40.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is being filed under Seal.

41.    This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010) ("PPACA").  Moreover, Relator affirmatively disclosed his allegations to the United States Attorney's Office for the Eastern District of Pennsylvania prior to filing this action.

42.    To the extent there has been a public disclosure of the information upon which the allegations of this Complaint are based that is unknown to Relator, Relator is an "original source" of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the PPACA, *supra*, and similar state law provisions.

43.    Relator possesses direct and independent knowledge of the information in this Complaint by virtue of his role as a former employee of ADCS.

44.    Relator's counsel voluntarily provided the United States with information related to this claim prior to filing this action.  *See* 31 U.S.C. § 3730(e)(4).

## V.    FACTUAL ALLEGATIONS

45.    Defendants are engaging in at least three types of fraudulent billing practices that have led to Government Healthcare Programs paying false claims totaling many millions of dollars.  The fraudulent practices include, but are not limited to:

- Forcing providers to inappropriately upcode new patient visits and bill for higher

amounts;

- Forcing providers to conduct medically unnecessary TBSEs and bill higher amounts for the associated upcoded visits; and

- Billing for self-referred dermatopathology DHS prohibited by Stark Law.

Each of these fraudulent schemes will be elucidated in greater detail herein.

### A. Forcing Providers to Inappropriately Upcode New Patient Visits and Bill for Higher Amounts

#### i. Background

46.     For decades, the new patient E/M CPT code range was from 99201-99205.  Each code is reimbursed at a sequentially higher level by CMS.  In other words, code 99201 is reimbursed the least of the five new patient E/M CPT codes.

47.     The E/M CPT coding methodology was completely overhauled for calendar year 2021, but, through the end of 2020, CPT code 99201 was required to be used when providers saw a new patient and, at a minimum, took a problem-focused history, conducted a problem-focused exam, and used straightforward medical decision making.  CPT code 99202 was required to be used when providers saw a new patient and, at a minimum, took an *expanded* problem-focused history, conducted an *expanded* problem-focused exam, and used straightforward medical decision making.

48.     In practical application in the field of dermatology, the main difference between a new patient visit calling for code 99201 versus code 99202 was the extent of the physical exam.

- If a dermatologist examined less than 6 body areas or organ systems, then code 99201 was required to be used.

- If 6 or more body areas or organ systems were examined, then code 99202 could be used.

49.     For example, if a new patient requested that only one spot on his/her arm be examined, then only 1 body area would be examined, and code 99201 would be used.  In order to qualify for CPT code 99202, the dermatologist would have to examine 5 additional body areas or organ systems.

50.     According to the official Medicare Claims Processing Manual, Medicare guidelines state that "Medical necessity of a service is the overarching criterion for payment in addition to the

individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." Chapter 12 Section 30.6.1(A).

51.     Thus, in order to bill the higher 99202 code for the above example, it would have to be medically necessary and warranted to examine 5 additional body areas or systems.

52.     Examining 6 body areas or organ systems for a new patient that only has one spot of concern is typically not medically necessary and thus cannot, and should not, be billed.

**ii.     Fraudulent Behavior**

53.     On the night of February 26, 2020, ADCS' Medical Executive Committee sent an email to every ADCS provider (approximately 350 providers) across the country about the 99201 code.  The email instructed all providers to cease the use of the 99201 code.  Moreover, the company stated it would be closely monitoring each provider's billing data for compliance with this mandate, and the company expected that use of the 99201 code would be fully eliminated within the following couple of weeks.

54.     The ensuing weeks showed a zealous effort by all levels of ADCS leadership to eliminate providers' use of this code.  Through multiple emails and phone calls, office managers, regional vice presidents, and members of the Medical Executive Committee followed up individually with every ADCS provider who was still using the 99201 code to ensure that they stopped.

55.     When caring for his patients that were shared with other ADCS providers (e.g., a patient would see another ADCS provider for the initial visit, then see Relator for a follow-up visit due to his better availability), Relator had access, through the electronic medical record ("EMR"), to the other provider's medical notes for the patients.  Along with the medical note, Relator also had access in the EMR to the medical billing claim form (CMS-1500; blank sample attached as Exhibit A) that was generated and submitted to CMS to obtain payment for each visit.

56.     Following ADCS leadership's mandate, Relator observed that other ADCS providers eliminated their use of the 99201 code and upcoded to at least the 99202 code, even when the 99201 code should have been used.

### iii.    Retaliation and Termination

57.    In early March 2020, Relator was contacted by two office managers, a Medical Executive Committee member, and the Regional Vice President regarding his continued use of the 99201 code.  When contacted by these ADCS leaders, Relator informed them that not using the 99201 code when indicated was inappropriate and illegal.

58.    After Relator emailed several ADCS executives stating the above, the Defendants escalated the situation so that three out of its seven Medical Executive Committee members were involved in an effort to persuade the Relator to eliminate his use of the code.

59.    On March 27, 2020, approximately two weeks after he first pushed back against the upcoding scheme and informed ADCS executives of the scheme's illegality, Relator was terminated by the Defendants without cause.  The Defendants used the start of the COVID-19 pandemic as the pretext to justify the Relator's termination.

**B.    Forcing Providers to Conduct Medically Unnecessary TBSEs and Bill Higher Amounts for the Associated Upcoded Visits**

### i.    Background

60.    In the field of dermatology, TBSEs are generally recommended for high-risk individuals, such as those with a history of skin cancer, to examine the body for new or recurring skin cancers.  However, for asymptomatic or low-risk individuals, screening TBSEs have not been recommended by professional organizations due to the potential for harm and unintended consequences, including unnecessary biopsies and procedures, overtreatment, resulting cosmetic disfigurement, and functional adverse effects.

61.    For example, skin cancer screening in asymptomatic or low-risk individuals is not recommended by the United States Preventive Services Task Force (USPSTF), the main organization in the country that determines cancer screening guidelines.  In its assessment, the USPSTF could not adequately determine that the benefits outweighed the risks of skin cancer screening: "The USPSTF concludes that the current evidence is insufficient to assess the balance of benefits and harms of visual skin examination by a clinician to screen for skin cancer in adults."  USPSTF Final Recommendation Statement on Skin Cancer Screening,

*available at* https://www.uspreventiveservicestaskforce.org/uspstf/document/RecommendationStatementFinal/skin-cancer-screening.  The USPSTF found that "The potential for harm clearly exists, including a high rate of unnecessary biopsies, possibly resulting in cosmetic or, more rarely, functional adverse effects, and the risk of overdiagnosis and overtreatment."  Of note, the national professional organization for dermatologists, the American Academy of Dermatology, and the national organization focused on cancer treatment and prevention, the American Cancer Society, also both do not have guidelines or recommendations for skin cancer screening.

62.    The Affordable Care Act requires Medicare to cover any screening that receives a USPSTF grade A or B.  TBSEs received a grade I (Insufficient Evidence).

63.    Therefore, TBSEs are not covered by Medicare for asymptomatic or low-risk individuals and are deemed medically unnecessary.

64.    Nonetheless, performing a TBSE often has the effect of upcoding a visit to a higher E/M CPT level, which then leads to higher payment from CMS.

65.    According to the official Medicare Claims Processing Manual, Medicare guidelines state that "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." Chapter 12 Section 30.6.1(A).

66.    In its 1997 Documentation Guidelines for Evaluation and Management Services, CMS provides guidance on the extent of an exam that is medically necessary: "The type and content of examination are selected by *the examining physician* and are based upon clinical judgment, the patient's history, and the nature of the presenting problem(s)."  (pg. 11) (parentheticals removed) (emphasis added).  In this way, the exam for each patient is supposed to be selected by the physician (not a corporation) and be specifically tailored for each patient.

ii.    **Fraudulent Behavior**

67.    On January 7, 2019, ADCS Clinics, LLC published an official company policy that all ADCS providers across the country were required to follow.  The policy requires that all patients be provided a TBSE at a patient's initial visit and at least annually thereafter.

68.     Per the company policy, the TBSE is supposed to include examination of the genitalia and buttocks.

69.     The company policy states that TBSEs should be performed regardless of the patient's chief complaint.  A TBSE is to be performed for every single patient – no matter his/her medical history, symptoms, age, or risk factors.

70.     Therefore, for example, ADCS instructed its providers to perform a TBSE on a 14-year-old coming in for acne or a 98-year-old coming in for dry hands.  The unrestricted use of TBSEs often led to upcoding and higher payments for such visits.

71.     The company policy was distributed to providers, available on the company intranet, and posted on the walls in some clinics for providers to see every day.

72.     Not only are providers required to follow this policy, but the medical assistants who room patients are also required to follow the policy.  Per the policy, medical assistants are required to offer every patient a TBSE and tell the patient that the provider recommends the patient have one – all before the provider even has a chance to see and evaluate the patient.

73.     The policy states that ADCS will monitor providers to ensure compliance with the policy through reports and audits.

74.     To this end, ADCS maintains an internal Provider Dashboard that tracks and evaluates all providers based on the percentage of their patients receiving a TBSE.  The scoring is done across all of a provider's patients – regardless of a patient's chief complaint, medical history, symptoms, age, or risk factors.  The company sets benchmarks of TBSE percentages that all providers are supposed to achieve.

75.     The policy states that any employee violating the policy could be subject to disciplinary action.

76.     When caring for his patients that were shared with other ADCS providers, Relator had access through the EMR to the other provider's medical notes for those patients.  Along with the medical notes, Relator also had access in the EMR to the medical billing claim form (CMS-1500; blank sample attached as Exhibit A) that was generated and submitted to CMS to obtain payment for each visit.

77.     In his review of the prior visit notes and the submitted claim forms, Relator saw many examples of medically unnecessary TBSEs increasing the code billed to Medicare.

78.     Similarly, Relator also became aware of other medically unnecessary or medically inappropriate procedures being performed by ADCS providers.

**C.    <u>Billing for Self-Referred Dermatopathology DHS Prohibited by Stark Law</u>**

**i.    Background on Stark Law**

79.     The Physician Self-Referral Law, commonly referred to as Stark Law (42 USC § 1395nn and 42 CFR §§ 411.350, *et seq.*), is a healthcare fraud and abuse law that prohibits physicians from referring patients for DHS paid for by CMS to any person/entity in which the physician has a financial relationship.

80.     Such referral of DHS is prohibited unless the financial relationship falls under one of the enumerated Stark Law exceptions.  The exceptions have specific criteria that must be met in order for them to take effect.

81.     In contrast to the Federal Anti-Kickback Statute, Stark Law is only a civil enforcement statute.  Thus, a Stark Law violation is not a crime in and of itself.  However, a violation of Stark Law may also constitute a violation of other applicable statutes, which could result in criminal prosecution.

82.     Stark Law is a strict liability statute that is violated whenever a prohibited referral is made or a claim is submitted based on that prohibited referral – regardless of whether the provider intended, knew, or should have known that such actions were breaking the law.

83.     Compliance with Stark Law is mandatory for all medical providers.

84.     The consequences for providers and practices that violate Stark Law include large fines and penalties as well as exclusion from participation in federal health care programs.

**ii.    Background on Dermatopathology**

85.     A typical dermatologist performs thousands of skin biopsies and hundreds of excisions each year.  Each skin biopsy and excision produces a skin specimen that needs to be sent to a dermatopathologist to be processed and evaluated.

86.     These dermatopathology referrals are referrals of DHS as defined by Stark Law.

87.    Each specimen can be worth hundreds of dollars of reimbursement from CMS depending on how many stains the dermatopathologist uses.

88.    Independent dermatologists can typically choose which dermatopathologist to refer their specimens to.  This is important because, among other things, a dermatologist must have a good working relationship with his/her dermatopathologist.  A good working relationship is critical because the dermatologist and dermatopathologist must be able to trust one another and feel confident in the other's medical knowledge/skills.  They frequently have to collaborate to put the clinical and microscopic information together to make the correct diagnosis for a patient.

### iii.    Fraudulent Behavior

89.    The dermatologists employed by ADCS are contractually required to refer all of their dermatopathology specimens to dermatopathologists employed by ADCS, except in rare situations.

90.    Stark Law calls this kind of arrangement a "directed referral requirement."  42 CFR § 411.354(d)(4).

91.    This type of arrangement is prohibited by Stark Law, unless the arrangement satisfies specific conditions as set forth in 42 CFR § 411.354(d)(4).

92.    In pertinent part, this statute reads:

> If a physician's compensation under a *bona fide* employment relationship ... is conditioned on the physician's referrals to a particular provider, practitioner, or supplier, all of the following conditions must be met. …
>
> (ii) The compensation is consistent with the fair market value of the physician's services.
>
> (iii) The compensation arrangement otherwise satisfies the requirements of an applicable exception at § 411.355 or § 411.357. …

42 CFR § 411.354(d)(4).

93.    For ADCS dermatologists that supervise one or more mid-level providers ("MLPs"), the above conditions are not met.  This will be illustrated below.

### a.    Compensation Above Fair Market Value

94.    ADCS' dermatologists are employees of, and paid directly by, ADCS.  This creates a direct financial relationship as defined by Stark Law between ADCS and the dermatologist.

95.    Often, dermatology practices employ and utilize MLPs, such as nurse practitioners or physician assistants, to biopsy, diagnose, treat, and prescribe for patients.

96.    ADCS employs approximately 200 MLPs who are each in turn linked to and supervised by an ADCS dermatologist.

97.    The supervising dermatologist is compensated by ADCS for his/her supervision.

98.    CMS has provided guidance on how to compensate supervising physicians for their supervision of MLPs in order to satisfy the bona fide employment relationships exception:

> We see nothing in the exception that would bar flat fee compensation based on the number of mid-level providers under the physician's supervision, as long as the compensation is fair market value for actual time dedicated to supervision services ....

69 FR 16053.

99.    Under ADCS' standard employment contract, a dermatologist does not receive a flat fee for MLP supervision; rather, he or she receives a percentage of the net collected receipts generated by each MLP he/she supervises.

100.    Under this arrangement, for supervising one very productive MLP, a dermatologist can earn more than $100,000 per year.

101.    Outside of ADCS, typical compensation for supervision of an MLP ranges from $10,000-$15,000 per year.  *See* https://www.pyapc.com/insights/top-5-physician-specialties-where-app-supervision-stipends-are-common/.

102.    Most of the states where ADCS operates allow each dermatologist to supervise up to 4 MLPs at a time.  However, some states allow more.  For example, Arizona, South Carolina, and Virginia allow supervision of up to 6 MLPs, and Colorado allows supervision of up to 8 MLPs.

103.    Therefore, an ADCS dermatologist could earn more than half a million dollars per year just for their supervision of several MLPs.

104.    Supervision of an MLP is frequently a negligible commitment of time and is usually more of a formality.  For example, in every state in which ADCS operates, supervision requirements of an MLP do not require the dermatologist to be physically present – or even to be nearby or in the same city/state – but rather only require the dermatologist to be available to the MLP via telephone.

*See* AMA Physician Assistant Scope of Practice PDF; *available at* https://www.ama-assn.org/practice-management/scope-practice/scope-practice-key-tools-resources (newest version) and https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/arc-public/state-law-physician-assistant-scope-practice.pdf (older version).

105.    Given the above, an ADCS dermatologist receiving a percentage of an MLP's collections will typically receive an amount of remuneration far exceeding the fair market value for MLP supervision.

106.    Thus, for ADCS dermatologists that supervise one or more MLPs, the "fair market value" condition of 42 CFR § 411.354(d)(4) is not met.

**b.    Failure to Satisfy the Requirements of an Applicable Stark Law Exception in 42 CFR § 411.355 or 42 CFR § 411.357**

107.    If an employer has a "directed referral arrangement," it is necessary that "[t]he compensation arrangement otherwise satisfies the requirements of an applicable exception at § 411.355 or § 411.357. …"42 CFR § 411.354(d)(4)(iii).

108.    The two most relevant exceptions are the bona fide employment relationships exception (42 CFR § 411.357[c]) and the in-office ancillary services exception (42 CFR § 411.355[b]).

109.    The bona fide employment relationships exception requires that the employee's remuneration is "consistent with the fair market value of the services" and "is not determined in any manner that takes into account the volume or value of referrals by the referring physician."  42 CFR § 411.357(c)(2)(i-ii).

110.    The in-office ancillary services exception requires that the referral be to a physician or an individual supervised by a physician that is in the same "group practice" as the referring physician. *See* 42 CFR § 411.355(b)(1)(ii-iii).  "Group practice" has a specific definition defined in 42 CFR § 411.352.  Two of the requirements to qualify as a "group practice" are that "[t]he States in which the group practice is operating are contiguous (although each State need not be contiguous to every other State)" and that "[n]o physician who is a member of the group practice directly or indirectly receives compensation based on the volume or value of his or her referrals ...".  42 CFR § 411.352 (a)(1) and

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

(g).

111.    As will be shown below, the requirements for neither of these exceptions are met for ADCS dermatologists that supervise an MLP.

## I.    Violation of the Bona Fide Employment Relationships Exception

112.    The bona fide employment relationships exception cannot be used because of the following reasons:

### 1.    Compensation Above Fair Market Value

113.    As shown above, supervising dermatologists receive compensation far above fair market value.

114.    This by itself is a violation of the bona fide employment relationships exception.

### 2.    Compensation That Takes Into Account the Volume or Value of Referrals

115.    In addition to receiving compensation far above the fair market value, the supervising dermatologist also receives compensation that "takes into account the volume or value of referrals by the referring physician."  42 CFR § 411.357(c)(2)(ii).

116.    Stark Law defines this further: "Compensation from an entity furnishing designated health services to a physician takes into account the volume or value of referrals only if the formula used to calculate the physician's compensation includes the physician's referrals to the entity as a variable, resulting in an increase or decrease in the physician's compensation that positively correlates with the number or value of the physician's referrals to the entity."  42 CFR § 411.354(d)(5)(i) (parentheticals omitted).

117.    The supervising dermatologist's compensation positively correlates with the number of referrals by the dermatologist.  More specifically, if the dermatologist refers a patient to his/her MLP and the plan of care involves DHS performed by the MLP, then the dermatologist will receive a percentage of the money paid by CMS for the DHS.  This is because the dermatologist's compensation arrangement with ADCS includes a percentage of the MLP's net collected receipts.  Therefore, the more DHS an MLP performs, the more money the supervising dermatologist will

receive.

118.    MLPs frequently bill for DHS.  For example, in dermatology it is common for an

MLP to bill for routine venipuncture (CPT 36415), urine pregnancy tests (CPT 81025), KOH preps

(CPT 87220), scabies preps (CPT 87220), Tzanck smears (CPT 87207), and superficial radiation

therapy for skin cancer (CPT 77280 and CPT 77401).

119.    Referrals from a dermatologist to his/her MLP are common because well-established

dermatologists are generally booked out for months, whereas MLPs generally have availability much

sooner.  Therefore, if a patient needs to have a follow-up visit sooner than the dermatologist's next

available appointment, it is common for the dermatologist to instruct the patient to follow-up with

his/her MLP.

120.    Exhibit B shows the de facto formula used to calculate the compensation of an ADCS

dermatologist that supervises an MLP.  The most pertinent variables are underlined.  Although the

DHS components might only be a relatively small percentage of the MLP's overall collections and

the dermatologist's compensation, the Stark Law employment exception does not allow for

remuneration that is in any part based on the volume or value of DHS referrals, even if the volume or

value is small.

121.    Because the supervising dermatologist receives compensation exceeding fair market

value and because the compensation also positively correlates with the number of referrals of DHS to

the MLP, the dermatologist's financial relationship with ADCS does not meet the requirements of the

bona fide employment relationships exception.

## II.    Violation of the In-Office Ancillary Services Exception

122.    The in-office ancillary services exception can only be used for referrals to "[a]

physician who is a member of the same group practice as the referring physician."  42 CFR §

411.355(b)(1)(ii).  While the ADCS dermatopathologists are physicians, they are not members of the

same "group practice" as defined by Stark Law.

123.    "Group practice" has a specific definition under Stark Law (42 CFR § 411.352), and

all conditions of the definition must be met for a practice to qualify as a "group practice."

1. **Compensation That Takes Into Account the Volume or Value of Referrals**

124.    One condition for a practice to qualify as a "group practice" is that "[n]o physician who is a member of the group practice directly or indirectly receives compensation based on the volume or value of his or her referrals." 42 CFR § 411.352(g).As illustrated previously, the compensation arrangements between ADCS and its dermatologists that supervise MLPs do vary with the volume or value of the dermatologists' referrals. This alone invalidates the in-office ancillary services exception.

2. **Non-Contiguous States in Which the Practice Operates**

125.    In addition, for a multi-state practice to satisfy the "group practice" requirements, it is necessary that "[t]he States in which the group practice is operating are contiguous (although each State need not be contiguous to every other State)." 42 CFR § 411.352(a)(1).

126.    ADCS operates in many states that are not contiguous (Exhibit C). For example, ADCS has an office in Rhode Island that is not contiguous or near any of the other states ADCS operates in. ADCS dermatologists often send their specimens to dermatopathologists in another state. ADCS' Rhode Island office sends its pathology specimens to Alabama. Similarly, ADCS' offices in Michigan and Maryland also send their pathology to Alabama.

127.    This is a violation of the "group practice" contiguous requirement and further invalidates the in-office ancillary services exception.

c. **Conclusion**

128.    As shown above, the conditions for the directed referral requirement (42 CFR § 411.354[d][4][ii-iii]) are not met.

129.    Therefore, the requirement to send specimens to ADCS dermatopathologists is a Stark Law violation.

130.    Moreover, all self-referrals of specimens to ADCS dermatopathologists by ADCS dermatologists that supervise MLPs are violations of Stark Law.

131.    This makes potentially hundreds of thousands of ADCS' dermatopathology claims into Stark Law violations each year.

## VI.    CAUSES OF ACTION

### COUNT ONE
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### (31 U.S.C. § 3729(a))

132.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

133.    Defendants' mandatory upcoding of visits, disregard for medical necessity of exams/procedures, and violations of Stark Law, as described herein, give rise to liability under the FCA.

134.    When caring for his patients that were shared with other ADCS providers, Relator had access through the EMR to the other provider's medical notes for those patients.  Along with the medical note, Relator also had access in the EMR to the medical billing claim form (CMS-1500; blank sample attached as Exhibit A) that was generated and submitted to CMS to obtain payment for each visit.

135.    On every medical billing claim form (CMS-1500) that was submitted to CMS to obtain payment, Defendants expressly certified the accuracy of the CPT coding, the medical necessity of the services provided, and compliance with Stark Law.

136.    Therefore, every claim submitted where such certification was false is a false or fraudulent claim as referenced by the FCA, 31 U.S.C. § 3729(a)(1).

137.    Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by submitting claims, or causing the submission of claims, for reimbursement from Government Healthcare Programs knowing that they were ineligible for the demanded payments due to inaccurate CPT coding, medically unnecessary services, and Stark Law violations.

138.    Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim (e.g., false certifications and representations regarding the accuracy of CPT coding, the medical necessity of exams, and compliance with Stark Law).

139.    Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit the

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

above FCA violations.

140.    All of the Defendants' conduct described in this Complaint was knowing, as that term is defined in the FCA, 31 U.S.C. § 3729(b)(1).

141.    Due to the Defendants' conduct, the Government has suffered substantial monetary damages.

## COUNT TWO
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT'S RETALIATION PROTECTIONS
### (31 U.S.C. § 3730(h))

142.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

143.    31 U.S.C. § 3730(h)(1) provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

144.    Relator was terminated without cause by the Defendants approximately two weeks after he pushed back against one of the Defendants' upcoding schemes and informed executives of the scheme's illegality.

145.    During his employment at ADCS, Relator's performance consistently met or exceeded expectations, and he never had any complaints or criticism relating to his care or treatment of patients.

146.    Relator was terminated because of his efforts to stop the Defendants from perpetuating False Claims Act violations.

147.    Relator engaged in activity protected under the statute by reporting concerns about misconduct and illegal behavior which reasonably could lead to a viable False Claims Act action.

148.    Relator in good faith believed that the actions of the company and the company's agents violated FCA regulations, among other things.

149.    ADCS, including and through its management team, knew that Relator engaged in the protected activity.

150.    The actions of the Defendants, through ADCS' agents, servants and employees, in, among other things, terminating Relator's employment in retaliation for having engaged in protected activity, namely, for having highlighted and internally reported the Defendants' ongoing illegal actions, constituted a violation of 31 U.S.C. § 3730(h)(1).

151.    As a result of such retaliation and discrimination, Relator has suffered, and will continue to suffer, economic damages for lost wages and back pay, emotional distress, worry, anxiety, and humiliation, and is entitled to compensation for these damages.

152.    As a result of such retaliation and discrimination, Relator has incurred attorney fees and costs and other expenses in an amount to be determined at time of trial.

### COUNT THREE
### VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT'S RETALIATION PROTECTIONS
### (Colo. Rev. Stat. § 25.5-4-306(7))

153.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

154.    Colo. Rev. Stat. § 25.5-4-306(7) provides:

An employee, contractor, or agent shall be entitled to all relief necessary to make the employee, contractor, or agent whole, if the employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by the defendant or by any other person because of lawful acts done by the employee, contractor, or agent, or associated others in furtherance of an action under this section or in furtherance of an effort to stop any violations of section 25.5-4-305.

155.    Relator was terminated without cause by the Defendants approximately two weeks after he pushed back against one of the Defendants' upcoding schemes and informed executives of the scheme's illegality.

156.    During his employment at ADCS, Relator's performance consistently met or exceeded expectations, and he never had any complaints or criticism relating to his care or treatment of patients.

157.    Relator was terminated because of his efforts to stop the Defendants from perpetuating Colorado Medicaid False Claims Act violations.

158.    Relator engaged in activity protected under the statute by reporting concerns about misconduct and illegal behavior which reasonably could lead to a viable Colorado Medicaid False Claims Act action.

159.    Relator in good faith believed that the actions of the company and the company's agents violated Colorado Medicaid False Claims Act regulations, among other things.

160.    ADCS, including and through its management team, knew that Relator engaged in the protected activity.

161.    The actions of the Defendants, through ADCS' agents, servants and employees, in, among other things, terminating Relator's employment in retaliation for having engaged in protected activity, namely, for having highlighted and internally reported the Defendants' ongoing illegal actions, constituted a violation of Colo. Rev. Stat. § 25.5-4-306(7).

162.    As a result of such retaliation and discrimination, Relator has suffered, and will continue to suffer, economic damages for lost wages and back pay, emotional distress, worry, anxiety, and humiliation, and is entitled to compensation for these damages.

163.    As a result of such retaliation and discrimination, Relator has incurred attorney fees and costs and other expenses in an amount to be determined at time of trial.

## COUNT FOUR
## VIOLATIONS OF STARK LAW
### (42 USC § 1395nn and 42 CFR §§ 411.350, *et seq.*)

164.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

165.    Defendants' conduct described herein constitutes a violation of Stark Law, 42 USC § 1395nn and 42 CFR §§ 411.350, *et seq.*

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

166.    Defendants require their employed dermatologists to refer all of their skin specimens to the Defendants' dermatopathologists, except in rare situations.

167.    Each and every dermatopathology referral, by an ADCS dermatologist that supervises an MLP, violates Stark Law if the referral involves a Medicare or Medicaid patient, because the compensation arrangement for the supervision does not fall under a Stark Law exception.

168.    This creates potentially hundreds of thousands of prohibited referrals each year for ADCS.

169.    Defendants have systematically billed the Government for services provided through such prohibited referrals.

170.    Defendants submitted claims to CMS based on prohibited referrals and, in doing so, falsely certified compliance with Stark Law.

171.    The Stark Law violations which occurred and continue to occur create strict liability for the Defendants.  A violation of Stark Law is not based on what the Defendants intended, knew, or should have known.  There is no scienter component of a Stark Law violation.

## COUNT FIVE
### VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
(Colo. Rev. Stat. § 25.5-4-304 *et seq.*)

172.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

173.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq.*

174.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

175.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

allowed.

176.    By reason of the Defendant's unlawful acts, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX
## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT
### (Fla. Stat. § 68-081 *et seq.*)

177.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

178.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68-081 *et seq.*

179.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

180.    The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

181.    By reason of the Defendants' unlawful acts, the Florida Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN
## VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
### (Ga. Code § 49-4-168 *et seq.*)

182.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

183.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code § 49-4-168 *et seq.*

184.    By virtue of the illegal acts, as described more fully above, Defendants knowingly

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

185.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

186.    By reason of the Defendant's unlawful acts, the Georgia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT
### VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT
#### (Md. Code Ann., Health-Gen § 2-601 *et seq.*)

187.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

188.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Ann., Health-Gen § 2-601 *et seq.*

189.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

190.    The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

191.    By reason of the Defendants' unlawful acts, the Maryland Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

<u>COUNT NINE</u>
**VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**(Mich. Comp. Laws Serv. § 400.601 *et seq.*)**

192.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

193.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq.*

194.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

195.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

196.    By reason of the Defendants' unlawful acts, the Michigan Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

<u>COUNT TEN</u>
**VIOLATIONS OF THE NEVADA SUBMISSION OF FALSE CLAIMS**
**TO STATE OR LOCAL GOVERNMENT ACT**
**(Nev. Rev. Stat § 357.010 *et seq.*)**

197.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

198.    This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat § 357.010 *et seq.*

199.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

200.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

201.    By reason of the Defendants' unlawful acts, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT ELEVEN
## VIOLATIONS OF THE RHODE ISLAND FALSE CLAIMS ACT
### (R.I. Gen. Laws § 9-1.1-1 *et seq.*)

202.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

203.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

204.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

205.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

206.    By reason of the Defendants' unlawful acts, the Rhode Island Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWELVE
## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### (Va. Code § 8.01-216.1 *et seq.*)

207.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

208.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against

Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*

209.    By virtue of the illegal acts, as described more fully above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Medicaid Program to approve and pay such false and fraudulent claims involving Defendants' upcoding, unnecessary exams/procedures, and illegal self-referrals.

210.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims and/or statements made by Defendants, paid for claims that otherwise would not have been allowed.

211.    By reason of the Defendants' unlawful acts, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator prays for the following relief:

A. Defendants be ordered to cease and desist from submitting and/or causing the submission of any more false claims or in any way from otherwise violating 31 U.S.C. § 3729 or similar state provisions;

B. That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim and so multiplied as provided by 31 U.S.C. § 3729(a) and similar state provisions, plus the maximum civil penalty adjusted for inflation for such claims, as provided by 31 U.S.C. § 3729(a) and similar state provisions;

C. Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. § 3730(d) and similar state provisions;

D. That judgment be granted for Relator and the United States of America and against Defendants for any costs, including but not limited to, court costs, expert fees, and all attorneys' fees incurred in the prosecution of this suit;

E. Judgment against the Defendants in an amount equal to a refund of all CMS

claims paid for DHS that resulted from an illegal referral, pursuant to 42 USC § 1395nn(g) and 42 CFR § 411.353(d);

F. Imposition of sanctions against Defendants, including denials of payments;

G. Imposition of penalties up to $15,000 for each claim and up to $100,000 for each compensation arrangement in violation of Stark Law;

H. For retaliation in violation of 31 U.S.C. § 3730(h), award compensation for economic damages sustained, in addition to any other compensatory, nominal, or punitive damages;

I. For retaliation in violation of 31 U.S.C. § 3730(h), award compensation for special damages for mental anguish and emotional suffering;

J. For retaliation in violation of 31 U.S.C. § 3730(h), award reinstatement with the same seniority status Relator would have had but for the discrimination;

K. For retaliation in violation of 31 U.S.C. § 3730(h), award all litigation costs, expert fees, and reasonable attorneys' fees incurred;

L. Pre-judgment and post-judgment interest; and

M. Such other relief as the Court deems just and appropriate.

## VIII.  DEMAND FOR JURY TRIAL

212.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam Relator hereby demands a trial by jury.

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

Date: December 2, 2021                    Respectfully submitted,


/s/ Benjamin J. Mayer
Benjamin J. Mayer, Esquire (*pro hac vice* pending)
Colorado Bar No. 53125
MAYER LAW FIRM, LLC
9609 S. University Blvd, #630235
Highlands Ranch, CO 80163
Phone: 720-515-9634
benjamin@mayercontractlaw.com


/s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr., Esquire
Pennsylvania Bar No. 81437
ROSS FELLER CASEY, LLP
One Liberty Place
1650 Market St, 34th Floor
Philadelphia, PA 19103
Phone: 215-574-2000
bmccormick@rossfellercasey.com

*Attorneys for Relator*

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
*United States ex rel. Mayer v. ADCS Clinics, LLC, et al.*

# EXHIBIT A

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

CARRIER →

PICA | | | | | | | | | | PICA | | |

1. MEDICARE (Medicare#)    MEDICAID (Medicaid#)    TRICARE (ID#/DoD#)    CHAMPVA (Member ID#)    GROUP HEALTH PLAN (ID#)    FECA BLK LUNG (ID#)    OTHER (ID#)    **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE   MM   DD   YY   SEX   M   F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self   Spouse   Child   Other

7. INSURED'S ADDRESS (No., Street)

CITY    STATE

8. RESERVED FOR NUCC USE

CITY    STATE

ZIP CODE    TELEPHONE (Include Area Code) ( )

ZIP CODE    TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   YES   NO

a. INSURED'S DATE OF BIRTH   MM   DD   YY   SEX   M   F

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   YES   NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   YES   NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   YES   NO   *If yes*, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED    DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED

PATIENT AND INSURED INFORMATION →

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)   MM   DD   YY   QUAL.

15. OTHER DATE   QUAL.   MM   DD   YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   MM   DD   YY   FROM   TO   MM   DD   YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   YES   NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind.

A.   B.   C.   D.
E.   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | CPT/HCPCS | MODIFIER | | | | | | |
| 1 | | | | | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | NPI | |

PHYSICIAN OR SUPPLIER INFORMATION →

25. FEDERAL TAX I.D. NUMBER   SSN EIN

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   YES   NO

28. TOTAL CHARGE $

29. AMOUNT PAID $

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED    DATE

32. SERVICE FACILITY LOCATION INFORMATION

a. NPI   b.

33. BILLING PROVIDER INFO & PH # ( )

a. NPI   b.

NUCC Instruction Manual available at: www.nucc.org    *PLEASE PRINT OR TYPE*    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.**

**NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If Item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed, Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

# EXHIBIT B

<u>Supervising Dermatologist Compensation</u>

Dermatologist Compensation = (x%)(non-DHS done by dermatologist) + (x%)(DHS done by dermatologist) +
(y%)(non-referred non-DHS done by MLP) + (y%)(non-referred DHS done by MLP)
+ (y%)(referred non-DHS done by MLP) + <u>(y%)(referred DHS done by MLP)</u>

# EXHIBIT C

<u>ADCS Map</u>

## Offices Nationwide

- Alabama
- Arizona
- Colorado
- Florida
- Georgia
- Maryland
- Michigan

- Nevada
- Ohio
- Pennsylvania
- Rhode Island
- South Carolina
- Virginia
- Wyoming



Source: https://www.advancedderm.com/about-us.  *Accessed 11/21/2021.*