IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JONATHAN MAYER,** | : | CIVIL ACTION |
| *Plaintiff-Relator*, | : | |
| | : | |
| v. | : | |
| | : | |
| **ADCS CLINICS, LLC,** *et al.*, | : | No. 21-cv-5303 |
| *Defendants*. | : | |

MEMORANDUM

**KENNEY, J.**                                                                 February 10, 2026

This is a case initiated pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and various similar state statutes. Defendants move for judgment on the pleadings or, in the alternative, dismissal for lack of subject matter jurisdiction. ECF No. 271. Defendants argue that judgment on the pleadings and dismissal are warranted because the False Claims Act's *qui tam* provisions violate the Appointments, Vesting, and Take Care Clauses of Article II of the Constitution. *See* ECF No. 271-1 at 13–25. For the reasons set forth below, Defendants' Motion (ECF No. 271) will be **DENIED**.

I.   **BACKGROUND**

The Court draws the facts set forth in this paragraph from the Complaint and accepts them as true on a motion for judgment on the pleadings, *see Zimmerman v. Corbett*, 873 F.3d 414, 417–18 (3d Cir. 2017), and on a motion to dismiss for lack of jurisdiction where the facts are not contested. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 290 (3d Cir. 2006). Defendants are a group of dermatology practices and other related entities. ECF No. 52 ¶¶ 18–19, 27. From September 2019 to March 2020, Relator Jonathan Mayer worked as a dermatologist for one defendant-practice, Defendant Advanced Dermatology of Colorado, P.C. *Id.* ¶¶ 15–16. On March 27, 2020, Relator was terminated from his employment with Advanced Dermatology of Colorado, approximately two weeks after objecting to a directive to use a certain billing code with a higher

reimbursement rate. *See id.* ¶¶ 88–90.

On December 2, 2021, Relator brought the instant action under the *qui tam* provisions of the False Claims Act and various similar state statutes. ECF No. 1 at 1; *see also* ECF No. 52 (operative Complaint). Relator alleges that Defendants engaged in three fraudulent practices in order to receive inflated reimbursement payments from government healthcare programs: (1) directing providers to use a billing code with a higher reimbursement rate for new patient visits (2) encouraging providers to conduct medically unnecessary total body skin exams, and (3) requiring dermatologists to refer specimens to dermatopathologists with whom a prohibited financial relationship exists, in violation of the Physician Self-Referral Law (known as the "Stark Law"), 42 U.S.C. § 1395nn.[1] ECF No. 52 ¶¶ 54, 76, 126, 131.

For approximately two years, the litigation remained under seal while the Government determined whether to intervene in Relator's suit. *See* 31 U.S.C. § 3730(b)(2) (stating that a *qui tam* complaint under the False Claims Act "shall be served on the Government" and "shall remain under seal for at least 60 days," after which "[t]he Government may elect to intervene"); *id.* § 3730(b)(3) (providing that "[t]he Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal"). On February 2, 2024, the Government elected not to intervene. ECF No. 28. However, the Government requested that if "either the relator or the defendant propose that this action be dismissed, settled, or otherwise discontinued," that the Court solicit the Government's written consent. *Id.* at 2 (citing 31 U.S.C. § 3730(b)(1)). The Government also requested continued service of all pleadings and orders and

---

[1] The Stark Law does not create a private right of action. *See Grant ex rel. United States v. Zorn*, 107 F.4th 782, 795 (8th Cir. 2024). However, a breach of the Stark Law can be the basis for a False Claims Act violation if it results in the submission of fraudulent claims to the government. *See id.*; *see also United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 396 (4th Cir. 2012).

reserved its right to intervene or to seek dismissal of Relator's claims. *Id.*

Following the Government's election not to intervene, the litigation proceeded. As relevant here, one day prior to the deadline for summary judgment and *Daubert* motions, Defendants moved for judgment on the pleadings or, in the alternative, for dismissal for lack of subject matter jurisdiction. *Compare* ECF No. 256 at 1 (setting forth the operative summary judgment deadline), *with* ECF No. 271 at 1. Subsequently, the Government filed a statement of interest opposing Defendants' Motion, ECF No. 297, and Relator opposed the Motion, too, ECF No. 298.

Defendants' Motion (ECF No. 271) is now before the Court.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(c) states that a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). To prevail on a motion for judgment on the pleadings, the party must establish that there are no material issues of fact and that the party is therefore "entitled to judgment as a matter of law." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (citation omitted). In deciding a motion for judgment on the pleadings, courts are generally limited to considering the pleadings, with certain exceptions, and must accept as true the allegations in the non-moving party's pleadings. *Zimmerman*, 873 F.3d at 417–18.

Federal Rule of Civil Procedure 12(b)(1) states that a party may move to dismiss an action for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

## III.   **DISCUSSION**

Defendants move for judgment on the pleadings, arguing that the *qui tam* provisions of the False Claims Act violate the Appointments, Vesting, and Take Care Clauses of Article II of the Constitution. *See* ECF No. 271-1 at 13–25. Additionally, Defendants argue that if the *qui tam* provisions of the False Claims Act are invalid, Relator lacks standing to bring claims under the

3

Act. *Id.* at 29–30. Accordingly, they also move the Court to dismiss Relator's claims under the False Claims Act for lack of subject matter jurisdiction and to decline supplemental jurisdiction over Relator's state-law claims. *Id.* at 29–31. Because Relator's *qui tam* action does not violate the Appointments, Vesting, and Take Care Clauses, the Court will deny Defendants' Motion.

### A. Appointments Clause

Defendants first challenge the False Claims Act's *qui tam* provisions under the Appointments Clause of Article II. That Clause, in relevant part, grants the President the power to appoint "Officers of the United States," with the advice and consent of the Senate, and permits Congress to vest the appointment of "inferior Officers . . . in the President alone," "Courts of Law" or "Heads of Departments." U.S. Const. art. II, § 2. An individual is an officer, and therefore subject to the Appointments Clause, when the individual (1) "occup[ies] a 'continuing' position established by law," and (2) exercises "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 237–38 (2018) (citations omitted).

Individual relators do not occupy government office, let alone a continuing government position, and therefore lack the first characteristic of officers. *See United States ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) (holding that "*qui tam* relators do not serve in any office of the United States[,]" given that they "are not entitled to the benefits of officeholders"). To determine whether an individual serves in a continuing position, courts have examined the individual's tenure, duration, salary, and duties associated with a position. *United States v. Germaine*, 99 U.S. 508, 511 (1878) (the term officer "embraces the ideas of tenure, duration, emolument, and duties"); *see Barker v. Conroy*, 282 F. Supp. 3d 346, 366 (D.D.C. 2017), *aff'd*, 921 F.3d 1118 (D.C. Cir. 2019); *United States v. Avalos*, 162 F.4th 948, 956 (9th Cir. 2025) (per curiam).

Based on these characteristics, relators do not occupy continuing government positions.

4

Relators are not afforded tenure; the Government can move to dismiss a relator's suit so long as it intervenes at any point in the litigation. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023) (hereinafter "*Polansky*"). And once an individual relator's suit is dismissed, their role as a relator is terminated, and they do not maintain any enduring responsibilities as a relator. Likewise, relators are not disciplined or penalized by the government for failing to carry out their expected duties; a relator merely risks an adverse ruling in their suit if they do not adequately litigate their case. *See Germaine*, 99 U.S. at 512 (civil surgeon was not an officer, including because "[t]here is no penalty for his absence from duty or refusal to perform, except his loss of the fee in the given case"). Nor do relators earn a salary. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 758 (5th Cir. 2001) (en banc). Though the False Claims Act entitles a relator to a percent of any recovered proceeds, *see* 31 U.S.C. § 3730(d), that amount is neither guaranteed, nor is it a salary paid by the United States. Without tenure, a government salary, or any criteria for performance—and, as discussed below, without any special government enforcement tools at their disposal—relators lack the hallmarks of a continuing government position and, indeed, government office. Instead, relators are private individuals who "in effect" sue as "partial assignee[s] of the United States." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 n.4 (2000) (emphasis omitted).

Defendants point to a test employed by the Second Circuit to determine if a special prosecutor qualified as an officer, which includes as a factor whether the "position is not personal to a particular individual." ECF No. 271-1 at 17 (citing *United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022)). Even assuming that test and factor apply, relators do not occupy continuing positions. Whether a position is personal turns on whether an individual, in carrying out their duties, can "be replaced by another." *Donziger*, 38 F.4th at 297. For instance, because an individual special prosecutor may be terminated and replaced with another special prosecutor, that position

5

is not "personal to a particular individual." *Id.* Unlike a special prosecutor, a relator litigating a *qui tam* action cannot be replaced by another relator—only that individual can pursue the *qui tam* suit. In pursuing a *qui tam* claim, a relator therefore occupies a position "personal to [that] particular individual." *Id.*

Defendants argue that even if a particular relator's tenure does not continue beyond any single suit, that alone does not bar someone from being considered an officer. *See* ECF No. 271-1 at 16. They cite to *Morrison v. Olson*, 487 U.S. 654 (1988), in which the Court held that an independent counsel appointed for a discrete purpose was an inferior officer. *See* ECF No. 271-1 at 16 (citing *Morrison*, 487 U.S. at 671 n.12, 672). And they note that bank receivers were similarly considered officers by courts "throughout the 19th and early 20th centuries," though their duties were tied to specific banks. *Id.* However, it is not the temporariness of an individual relator's role, by itself, that is dispositive of whether a relator occupies a continuing government position. Rather, the inquiry as to whether an individual occupies a continuing position is holistic. *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 201 (D.D.C. 2025) (noting that courts "take[] a holistic approach" to determining whether an individual occupies a continuing position). When considering all the factors, some discrete or time-limited roles are no doubt officer positions.[2] Relators—who face no consequences for not performing their duties, draw no government salary, have no access to unique government resources, and receive no tenure—are unlike such positions. False Claims Act relators therefore lack the first characteristic of federal officers.

Relators also lack the second characteristic of federal officers because they do not exercise

---

[2] Take, as an example, the independent counsel at issue in *Morrison*. The independent counsel was paid by the government, was required to document "major expenses" to the government, and had access to government investigative resources—all characteristics of government office. *Morrison*, 487 U.S. at 663 n.7, 671.

"significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. at 238 (citation omitted). The Supreme Court has stated that the "significant authority" standard is "framed in general terms," and has declined "to elaborate on [it]." *Id.* at 245. However, it has noted that the "inquiry [has] focused on the extent of [governmental] power an individual wields in carrying out his assigned functions." *Id.* For instance, in *Lucia v. SEC*, the Supreme Court highlighted that the SEC's administrative law judges possessed "nearly all the tools of federal trial judges" in concluding that they wielded significant governmental authority. *Id.* at 248. Courts of appeals have similarly focused on the extent to which the government authorizes an individual to utilize "the full machinery of the state." *See, e.g.*, *Donziger*, 38 F.4th at 299 (citation omitted) (holding that special prosecutors constitute officers).

Though relators enforce the False Claims Act, they do not possess any of the government tools and means that prosecutors, or other federal civil or criminal enforcement officers, leverage in carrying out their duties. *See Donziger*, 38 F.4th at 299 (noting a special prosecutor's power to "execut[e] search warrants, issu[e] subpoenas, grant[] immunity, [and] enter[] into plea bargains"). Instead, relators may use only the tools of ordinary civil litigation that are available to private plaintiffs. *See United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 760 (9th Cir. 1993) ("Qui tam relators pursue their claims essentially as private plaintiffs, except that the government may displace a relator" as the primary litigating party). This distinguishes relators from the types of officials to whom Defendants point—namely, Federal Election Commission officials and independent counsel, *see* ECF No. 271-1 at 14, each of whom was granted special investigative privileges.[3] *See Buckley v. Valeo*, 424 U.S. 1, 165–66 (1976) (enumerating Federal Election

---

[3] In response, Defendants cite *Seila Law* for the proposition that "'the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court constitutes 'significant,' 'quintessentially executive,' and 'officer'-level authority." ECF No. 271-1 at 14 (citing *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219, 224 (2020)). However, in

Commission's statutory powers, including to "require . . . any person to submit in writing such reports and answers to questions as the Commission may prescribe" and conduct investigations with government funding); *Morrison*, 487 U.S. at 671 (statute conferred on independent counsel the full prosecutorial powers of the Department of Justice).

The authority possessed by relators differs in another important respect: It is subject to the Government's broad authority to intervene and extinguish a relator's action or assume primary responsibility for the case. *See* 31 U.S.C. § 3730(c). By its very nature, a relator's authority is therefore circumscribed by the looming possibility of government intervention and dismissal. And the bar for the Government to move for a dismissal, once it has intervened, is exceedingly low— a court must treat the motion as a voluntary dismissal of the suit under Federal Rule of Civil Procedure 41(a). *See Polansky*, 599 U.S. at 424. But the exact standard for intervention and dismissal by the Government, and whether it comports with Article II, is not at issue here. In this suit, the Government initially declined to intervene and has subsequently never sought intervention or dismissal. *See* ECF No. 28. It suffices to say that the authority possessed by relators differs from that of other individuals, given the Government's ability to intervene in or fully dismiss a relator's suit.

Because an individual relator does not occupy a continuing position or exercise significant governmental authority, and instead enforces the False Claims Act through ordinary tools of civil litigation, relators are not federal officers subject to the Appointments Clause. All federal courts of appeals to address this issue have reached the same conclusion. *See Rockwell Int'l Corp.*, 282 F.3d at 804–07 (rejecting Appointments Clause and Take Care Clause challenges to False Claims

---

*Seila Law*, the Court's conclusion rested on the fact that the officer at issue—a bureau director— was able to wield "the coercive power of the state" in carrying out these actions. *Seila L. LLC*, 591 U.S. at 219–20. As discussed above, relators do not wield similar tools of the state.

Act's *qui tam* provisions); *Riley*, 252 F.3d at 753 (same); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec.*, 41 F.3d 1032, 1041–42 (6th Cir. 1994) (same); *Boeing Co.*, 9 F.3d at 751 n.6, 757–59 (same); *see also United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) (while interpreting whether the False Claims Act required the Government to intervene before moving to dismiss the action, reasoning that the False Claims Act "is not in imminent danger of unconstitutionally usurping the executive power").[4] And the one recent district court decision to the contrary—the district court decision in *Zafirov*—has been described as an "outlier." *United States v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-CV-84, 2024 WL 4784372, at *3 (E.D. Tenn. Nov. 7, 2024). Thus, the position that Defendants urge this Court to adopt is largely rooted in dissenting opinions, which are not binding on this Court. *See generally* ECF No. 271-1 (citing dissenting opinions in their brief twenty times).

Because False Claims Act relators are not federal officers subject to the Appointments Clause, Relator's *qui tam* action does not violate the Appointments Clause.

### B. Vesting and Take Care Clauses

Next, Defendants argue that the False Claims Act's *qui tam* provisions violate the Take Care and Vesting Clauses of Article II. The Take Care Clause states that the President shall "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Vesting Clause provides that the "executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. However, because it is impossible for one individual "to perform all the great business of the State," the Constitution contemplates that others will assist the President in carrying out executive duties. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010)

---

[4] As of the date of this opinion, the Eleventh Circuit heard argument in—but has not decided—an appeal concerning whether the *qui tam* provisions of the False Claims Act violate Article II. *See Zafirov v. Florida Med. Assocs., LLC*, No. 24-13581 (11th Cir.).

(citation omitted). Nonetheless, since the executive power remains "vested" in the President, "the Constitution has been understood to empower the President to keep these [other individuals] accountable," including "by removing them from office, if necessary." *Id.*

Defendants argue that the False Claims Act's *qui tam* provisions violate the Take Care and Vesting Clauses because *qui tam* suits permit relators to exercise executive power without adequate supervision or control. *See* ECF No. 271-1 at 20–25. But the False Claims Act empowers the Executive to oversee and control *qui tam* suits. The Executive can intervene at the onset of the case—and maintains the right to intervene at any point, upon a showing of good cause. *See Polansky*, 599 U.S. at 423. Even absent intervention, the Government may stay discovery in a relator's action if the action "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts." 31 U.S.C. § 3730(c)(4). And the Executive can move to dismiss a relator's action, which courts are required to treat as a voluntary dismissal—in effect terminating the relator's role. *See Polansky*, 599 U.S. at 424, 438–39. The Court need not address whether the standards for intervention later in the case or dismissal raise particular issues under Article II, since the Government never intervened in or sought dismissal of Relator's suit, so those specific *qui tam* provisions are not implicated here. Regardless, these provisions reflect that the False Claims Act contains a thorough scheme to ensure executive control over *qui tam* litigation.

Defendants argue that even if the Government may intervene in and dismiss a *qui tam* suit, the False Claims Act's *qui tam* provisions violate the Vesting Clause by forcing the Government to investigate relators' claim, regardless of other enforcement priorities. *See* ECF No. 271-1 at 21. To be sure, the False Claims Act does require the Government to "diligently . . . investigate" violations of the Act. 31 U.S.C. § 3730(a). But that is a "general statutory directive," rather than a requirement specific to *qui tam* actions. *Borzilleri v. Bayer Healthcare Pharms., Inc.*, 24 F.4th 32,

10

43 (1st Cir. 2022). And though the Government's initial period to intervene in a *qui tam* suit, while the complaint remains under seal, is sixty days, that period may be extended. *See* 31 U.S.C. § 3730(b)(3). In fact, the complaint here remained under seal for over two years before the Government declined to intervene. *Compare* ECF No. 1, *with* ECF Nos. 28, 29. Under these circumstances, the *qui tam* provisions of the False Claims Act did not usurp the executive branch's control of its enforcement priorities. Accordingly, *qui tam* relators do not violate the Vesting and Take Care clauses.

### C. History Supports that *Qui Tam* Suits Are Consistent with Article II

Lastly, Founding-era statutes and practices support that *qui tam* actions are consistent with Article II. These early practices and enactments "provid[e] 'contemporaneous and weighty evidence' of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023) (alteration in original) (citation omitted).

The First Congress enacted a number of *qui tam* statutes that provided both a bounty and a private right of action. *See Vt. Agency of Nat. Res.*, 529 U.S. at 777 & n.6.[5] These statutes built atop a "long tradition of *qui tam* actions" that runs through "the American Colonies" and to England, *id.* at 774, and which dates back hundreds of years, *see United States ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 251 (2d Cir. 2004) (tracing the first *qui tam* action in England back to the 13th century). Consistent with this history, Supreme Court decisions have multiple times reiterated that *qui tam* actions "have been in existence . . . since the foundation of our

---

[5] In *Vermont Agency of Natural Resources*, the Supreme Court pointed to the following statutes: Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 102; Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129; Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133; Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137–138; Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209; Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116). *See Vt. Agency of Nat. Res.*, 529 U.S. at 777 n.6.

[G]overnment."[6] *See Marvin v. Trout*, 199 U.S. 212, 225 (1905); *see also Vt. Agency of Nat. Res.*, 529 U.S. at 776–77; *cf. United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 (1943).

Defendants argue that some early *qui tam* statutes were "eventually rescinded" and "quickly fell into disuse." ECF No. 271-1 at 29 (quoting *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024)). But, even assuming that is true, any trend toward disuse was far from immediate, as the Second through Fourth Congresses likewise "promulgated numerous statutes authorizing *qui tam* actions." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1313 (11th Cir. 2021). And though the usage of *qui tam* statutes has waxed and waned over time, they preceded and followed the Founding era and have endured as part of American legal practice. Indeed, less than one hundred years after the Founding, Congress enacted the first iteration of the False Claims Act, under which it authorized *qui tam* suits. *See United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014). Though history does not "justify contemporary violations of constitutional guarantees," it "sheds light . . . on what the draft[ers] of [the Constitution] intended [the Constitution] to mean." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983). The long tradition of *qui tam* statutes, before and immediately after the Founding, supports that Relator's *qui tam* action does not violate Article II.

---

[6] In *Vermont Agency of Natural Resources*, the Supreme Court found this history "conclusive" to conclude that *qui tam* actions under the False Claims Act satisfied the case-or-controversy requirement of Article III and established a relator's standing. 529 U.S. at 777. It is dubious that this history could be "conclusive" as a matter of interpreting Article III, but not entitled at the very least to significant weight when interpreting Article II. *See Riley*, 252 F.3d at 753. Defendants attempt to distinguish *Vermont Agency of Natural Resources* by noting that "Article III borrowed from English practice," whereas "Article II departed from the English system" of parliamentary supremacy, entitling English legal traditions to less weight when interpreting Article II. *See* ECF No. 271-1 at 27 n.7 (citing *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting)). Even assuming that *qui tam* lawsuits theoretically embody a form of parliamentary supremacy that Article II sought to repudiate, the persistence of *qui tam* legislation in the early American colonies and during the firsts several Congresses supports the coexistence of *qui tam* actions with Article II.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendants' Motion for Judgment on the Pleadings and, in the Alternative, Dismissal for Lack of Subject Matter Jurisdiction (ECF No. 271).[7] An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**

---

[7] Because the Court denies Defendants' Motion on the merits, it need not reach Relator's argument that the Motion is untimely. *See* ECF No. 298 at 9–10. Likewise, it need not reach the Government's argument that Defendants were obligated to file a notice of constitutional challenge, pursuant to Federal Rule of Civil Procedure 5.1(b). *See* ECF No. 297 at 2 n.1 ("If the court does not plan to reject the constitutional challenge, the United States requests that the court certify the question to the Attorney General . . . .").